NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0672n.06
Filed: November 4, 2008

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**No. 07-4029**

| | | |
|---|---|---|
| PER-CO, LTD, et al., | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| GREAT LAKES FACTORS, et al., | ) | COURT FOR THE |
| | ) | NORTHERN DISTRICT OF |
| Defendants-Appellees. | ) | OHIO |
| | ) | |
| | ) | |

**BEFORE:**   **DAUGHTREY and McKEAGUE, Circuit Judges; and VAN TATENHOVE, District Judge.**[*]

**VAN TATENHOVE**, District Judge.  In this case, we are asked to consider whether the "mere continuation" exception applies to Ohio's general rule that a purchaser of a corporation's assets is not liable for the obligations of the seller corporation.  If it does, then RFC Banking Company's[1] ("the Bank") status as a secured creditor of a company called Great Lakes Funding, Inc. ("Funding")  will give the Bank priority over a group of legal entities controlled by James Perry, as unsecured creditors, in another company, Great Lakes Factors, Inc. ("Factors").  It is from Factor's bankruptcy proceeding that this adversary proceeding arose.

---

[*]The Honorable Gregory F. Van Tatenhove, United States District Judge for the Eastern District of Kentucky, sitting by designation.

[1]RFC Banking Company is a successor to the Peoples Banking Company.

- 1 -

Following a January 2007, bench trial on the specific issue of whether Factors is the alter ego of and/or successor to Funding, the district court entered an extensive order finding that Factors "acquired substantially all the assets of Funding [ ] and [ ] is a successor to Funding." Consequently, Judge Carr concluded that the "mere continuation" exception does apply. Since we agree, we affirm.

**I.**

Before exploring the relationships among the parties in this action, a word about the "factoring" business. In this commercial practice, the "factor" pays cash for accounts receivable from a business and thereby assumes the risk of loss and delayed payment in return for a discount of the face value. *See* 32 Am. Jur. 2d *Factors and Commission Merchants* § 2 (2008); *In re Herdean*, 92 Fed. App'x 107, 109 (6th Cir. 2003). The third parties who owe on the accounts receivable then make payments directly to the "factor." This allows the "factor's" customer immediate access to cash and removes the risk to the customer of uncollectible accounts receivable. As the district court noted, "[f]or factoring to work, a factoring company needs funds to pay its customers for the invoices." *Per-Co, Ltd. v. Great Lakes Factors, Inc.*, 509 F. Supp. 2d 642, 645 (N.D. Ohio 2007).

Funding is a "factoring" business. Thomas Bielski founded it as a sole proprietorship in approximately 1988. In 1992, Thomas's son, Jeffrey Bielski acquired 100 percent of Funding's stock from his father. However, Thomas and Jeffrey both continued to manage Funding. The Bank began lending to Funding in approximately 1999, ultimately extending $3.5 million in credit. This amount was memorialized in a Loan and Security Agreement between the Bank and Funding ("Loan Agreement"). The credit was collateralized by the invoices that Funding had purchased from its

clients. A Lockbox Agreement required Funding to instruct the invoice debtors to send their payments to a lockbox which was controlled by the Bank.

Perry owns and/or controls Per-Co and Perry Farms. Through these two entities, Perry began loaning money to the Bielskis when the Bank funding ran dry. Rather than Perry's money going into Funding, the Bielskis incorporated a new LLC, Factors, to receive the money from Perry. The Bielskis formed this new corporation in order to allay Perry's concerns about Funding's maxed out credit line with the Bank and the Bank's lien on Funding's assets. Because they learned that the LLC structure likely would not prevent Perry's loan from being subordinate to that of the Bank, however, the Bielskis attempted to create an Employee Stock Option Plan ("ESOP") within Factors. Under the ESOP, the Bielskis would own 79% of the stock, while the remaining shares would be held by the company's two other employees and the company's attorney. The ESOP would render any assets held for employees by the ESOP free of any claim of the Bank for the debt owed by Funding. No stock in Factors ever issued, however, and it appears the ESOP was never implemented.

The nature of the relationship between Funding and Factors is the heart of the issue on appeal. The Bielskis formed Factors on May 22, 2002. According to the Bank's expert, Howard Klein, whose testimony the district court determined to be more probative and persuasive than that offered by Perry, Funding was insolvent as of May 31, 2002. It is apparent from the record that at least one motivation in forming Factors was to enable the Bielskis to raise capital that would be outside the reach of the Bank.

The district court found that, beginning on June 17, 2002, and continuing through the end of the year, the Bielskis caused Funding to transfer much of its stock of invoices to Factors. The district court concluded that, as a result of these transfers, Factors came to possess the generally collectible

invoices while Funding was left with invoices that were less likely to be collectible. The district court described the Bielskis' methods as "varied, audacious, and remarkable." *Per-Co Ltd.*, 509 F. Supp. 2d at 648. Essentially, Factors used the cash provided by Perry to purchase collectible accounts from Funding. Funding, in turn, paid Factors' office and payroll expenses. Once more, the Bielskis jointly operated both Funding and Factors.

## II.

### A.

When reviewing the findings of the district court following a bench trial, the court applies a clearly erroneous standard to findings of fact and *de novo* standard to conclusions of law. Fed. R. Civ. P. 52(a); *Anderson v. City of Bessemer City, North Carolina*, 470 U.S. 564, 573-74 (1985); *Lindstrom v. A-C Product Liability Trust*, 424 F.3d 488, 492 (6th Cir. 2005). Also, "[g]reat deference is demanded when the factual findings required the judge to make credibility determinations." *Taylor Steel, Inc. v. Keeton*, 417 F.3d 598, 604 (6th Cir. 2005) (citing *Anderson*, 470 U.S. at 575). As to any distinctions in the standard of review applied to ultimate and subsidiary facts,

> Rule 52(a) broadly requires that findings of fact not be set aside unless clearly erroneous. It does not make exceptions or purport to exclude certain categories of factual findings from the obligation of a court of appeals to accept a district court's findings unless clearly erroneous. It does not divide facts into categories; in particular, it does not divide findings of fact into those that deal with "ultimate" and those that deal with "subsidiary" facts.

*Pullman-Standard v. Swint*, 456 U.S. 273, 287 (1982).

**B.**

The district court found that Factors inherited Funding's liabilities under two separate exceptions recognized in Ohio to the general rule that "the purchaser of a corporation's assets is not liable for the debts and obligations of the seller corporation." *Welco Indus., Inc. v. Applied Cos.*, 67 Ohio St. 3d. 344, 346 (1993) (citing *Flaugher v. Cone Automatic Machine Co.*, 30 Ohio St.3d 60, 30 (1987); *Cyr v. B. Offen & Co., Inc.*, 501 F.2d 1145 (1st Cir. 1974); 15 Fletcher, *Cyclopedia of the Law of Private Corporations*, Section 7122 (1990)). The district court held that, as a prerequisite to application of the exceptions, "Ohio law does not require a finding that the acquiring company acquired *all* of the assets of the [predecessor]." *Per-Co Ltd.*, 509 F. Supp. 2d at 647, n. 2. Instead, "[w]hat matters is that all or *substantially* all the assets were acquired." [*Id.*] As to the exceptions, the first occurs when "the buyer corporation is merely a continuation of the seller corporation." *Welco*, 67 Ohio St. 3d. at 347. The second is triggered if "the transaction is entered into fraudulently for the purpose of escaping liability." *Id.*

Addressing the issue of whether the first exception requires a finding that all of the predecessor's assets were acquired or that substantially all were acquired, the district court noted that in *Welco*, the Ohio Supreme Court considered whether the acquiring company was merely a continuation of the original company, even though some assets remained in the possession of the original company. The district court also cited *Mickowski v. Visi-Trak Worldwide, LLC*, 415 F.3d 501 (6th Cir. 2005), in which this court conducted an analysis of successor liability where the acquiring company purchased "substantially all" of the original company's assets. *Id.* at 503. While neither *Welco* nor *Mickowski* resulted in a finding of liability on the part of the acquiring corporation for the original companies' liabilities, the district court viewed as instructive the fact that both the

Ohio Supreme Court and this court conducted the analysis in cases where "substantially all" of the assets were purchased.

The district court further looked to the Tenth Circuit's decision in *Williams v. Bowman Livestock Equip. Co.*, 927 F.2d 1128 (10th Cir. 1991), applying Oklahoma law, holding that "a prerequisite for the imposition of liability against a corporation as a mere continuation of a predecessor is a sale or transfer of all, or substantially all, the assets of the latter to the former." *Id*. at 1132. Although the Tenth Circuit was applying Oklahoma law, "the successor liability test in Oklahoma is substantially the same as Ohio's Flaugher/Welco test." *Howell v. Atlantic-Meeco, Inc.*, 2002 WL 857685, at *2 (Ohio App. 2 Dist., 2002).

## C.

The district court's finding that substantially all of Funding's assets were transferred to Factors is reviewed for clear error. *See Medicine Shoppe Intern., Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 804 (8th Cir. 2003). The district court found, in essence, that the Bielskis caused the transfer of generally collectible invoices from Funding to Factors and left Funding with the invoices that were less likely to be collectible. As a result, Funding maintained accounts that had some value on paper; in reality, however, they were virtually worthless.

The district court found that this transfer was achieved as follows: First, money came in from entities controlled by Perry. The Bielskis used this money to purchase "good" invoices from Funding. Funding then used that money to pay Factors' operating expenses. This left Funding with neither collectible invoices nor cash paid for the collectible invoices it sold to Factors. Additionally,

payments received by Funding that should have been placed into the lockbox controlled by the Bank were instead transferred to Factors.

At the time it filed for bankruptcy, Funding claimed as assets customer accounts, invoices with a face value of close to $3.3 million, approximately $65,000 in cash, two cars with a combined value of just under $13,000, and a small amount of office furniture. Of Funding's retained customer accounts, Jeffrey testified that only three remained active. The district court found these accounts to be uncollectible and thus without value. The clearest support for this finding is the result of the collection efforts of Funding's Receiver, Mark Dottore ("Dottore"). Dottore collected approximately $2 million from Funding's remaining active accounts for the benefit of the Bank. In order to do so, however, Dottore had to expend in excess of $2.2 million, not including his own fees. Additional support is provided by the Bielskis' accountants, who wrote at the end of 2002 that "'[t]he accounts that are old and may be difficult to collect were left on Funding[']s records.'" *See Per-Co Ltd.*, 509 F. Supp. 2d at 649.

We agree that the record supports the district court's findings as to the transfer of assets. Consequently, the district court did not commit clear error in finding that Funding transferred substantially all of its assets to Factors.

**D.**

Next, we turn to Ohio's "mere continuation" test. This court recently explained the application of this test as follows:

> Under Ohio common law, a corporation is not a mere continuation of the corporation whose assets it has purchased, just because it continues to provide the same services. Under a "mere continuation" theory of successor liability, it is not enough to show

- 7 -

that the purported successor has "the same physical plant, officers, employees and product line as" the purported predecessor. Rather, "the basis of this [mere continuation] theory is the continuation of the corporate entity, not the business operation, after the transaction," such as when one corporation sells its assets to another corporation with the same people owning both corporations. "[T]he key element in establishing continuation is a common identity of stockholders, directors, and stock."

*Mickowiski*, 415 F. 3d 501, 509-10 (citations omitted) (alterations in original). In order "to protect corporations from unassumed liabilities[,]" the Ohio Supreme Court narrowly construes the mere continuation theory. *See Flaugher v. Cone Automatic Mach. Co.*, 30 Ohio St. 3d 60, 64 (1987). The mere continuation theory does not apply to arms length transactions between strangers; it further does not apply where there is no fraud or intent to escape liability.[2] *See Aluminum Line Prods. Co. v. Brad Smith Roofing Co., Inc.*, 109 Ohio App. 3d 246, 266 (1996).

As the district court concluded, and consistent with the record, the Bielskis owned and controlled both Funding and Factors. While Thomas was the original owner of Funding, he transferred his shares to his son, Jeffrey, in 1992, making Jeffrey the sole owner of Funding during the relevant time period. The Bielskis attempted to structure Factors in a manner that would alter the ownership from that of Funding. Regardless, the transactions between Funding and Factors were not at arms length.

The ownership of Factors is complicated by Factors' failure to issue its stock. This failure is significant to the analysis of Factors' ownership, and thus the ownership component of the "mere

---

[2]Ohio courts rightly have been careful to limit the scope of the "mere continuation" theory of successor liability for claims sounding in contract in order to allow firms legitimately to sell their corporate assets to pay debts of the corporation. *See, e.g., Welco*, 67 Ohio St. 3d at 348-49. Indeed, "[t]he sale of a corporation's assets is an important tool in raising liquid capital to pay off corporate debts." *Id.* For this reason, "mere continuation" liability must be limited so as to avoid "unnecessarily chill[ing] the marketplace of corporate acquisition." *Id.*

continuation" test. The Bielskis attempted to construct an employee stock ownership plan ("ESOP") through which the Bielskis would own 79% of the stock with the remainder held by two employees and their attorney. Had Factors successfully issued its shares to the ESOP, the result would have been employee ownership of Factors. This alteration in ownership, in turn, would have made the "mere continuation" theory inapposite and likely would have strengthened the Bielskis' attempt to escape Funding's debt obligations to the Bank. But, Factors issued no stock.

Since Factors failed to issue stock, the district court was required to determine who owns Factors. Here, the district court relied on corporate veil-piercing doctrine to conduct this fact based analysis. The district court found that Jeffrey, who held 100% of the stock in Funding, was the only person with any ownership interest in Factors. Specifically, the district court cites *In re Parton*, 137 B.R. 902, 905 (Bankr. S.D. Ohio 1991) for the proposition that a corporation's failure to issue stock is a factor in disregarding the corporate fiction. Factors' failure to issue stock, the district court found, "renders Factors (and its ESOP) a sham -- ownership in and control over the business, including Factors, remained with Jeffrey at all times." *Per-Co Ltd.*, 509 F. Supp. 2d at 653, n. 13.

Additionally, the district court found that Factors paid inadequate consideration for certain Funding assets. Essentially, Factors used the cash provided by Perry to purchase collectible accounts from Funding. Funding, in turn, used this money to pay Factors' office and payroll expenses. Given this scheme, even if Factors had paid near the market price for the Funding accounts, the consideration paid was directed to the benefit of Factors, thus making the net consideration inadequate.

As a result of the findings that Factors and Funding shared common shareholders and directors and that Factors paid inadequate consideration for Funding's assets, the district court found

that Factors was a "mere continuation" of Funding.  Since the record supports the district court's finding of "mere continuation," the district court did not commit clear error.[3]

**III.**

For the foregoing reasons, we affirm the district court's holding that Factors is a successor to Funding.  Specifically, we affirm the district court's denial of the relief requested in Count One of Plaintiff's Complaint for Declaratory Relief and the district court's grant of the relief requested by the Bank in the Third Counterclaims and Cross-Claims for Declaratory Relief.

---

[3]The district court found, alternatively, that the creation of Factors and its transactions with Funding meets the Ohio fraud exception to the general rule of successor nonliability.  We need not reach this question, however, given our holding regarding continuation.